1   XAVIER BECERRA
    Attorney General of California
2   DAVID A. ZONANA, State Bar No. 196029
    Supervising Deputy Attorney General
3   GEORGE TORGUN, State Bar No. 222085
    MARY S. THARIN, State Bar No. 293335
4   Deputy Attorneys General
     1515 Clay Street, 20th Floor
5    P.O. Box 70550
     Oakland, CA  94612-0550
6    Telephone:  (510) 879-1974
     Fax:  (510) 622-2270
7    E-mail:  Mary.Tharin@doj.ca.gov

8   *Attorneys for Plaintiff State of California*

    HECTOR BALDERAS
    Attorney General of New Mexico
    ARI BIERNOFF, State Bar No. 231818
    BILL GRANTHAM (*pro hac vice pending*)
    Assistant Attorneys General
     201 Third St. NW, Suite 300
     Albuquerque, NM 87102
     Telephone:  (505) 717-3520
     E-Mail:  wgrantham@nmag.gov

    *Attorneys for Plaintiff State of New
    Mexico*

9                IN THE UNITED STATES DISTRICT COURT

10            FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13   **STATE OF CALIFORNIA, by and through
     XAVIER BECERRA, ATTORNEY
     GENERAL, and the CALIFORNIA AIR
14   RESOURCES BOARD; and STATE OF
     NEW MEXICO, by and through HECTOR
15   BALDERAS, ATTORNEY GENERAL,**

16                                      Plaintiffs,

17                  **v.**

18   **UNITED STATES BUREAU OF LAND
     MANAGEMENT; KATHARINE S.
19   MACGREGOR,** Acting Assistant Secretary
     for Land and Minerals Management, United
20   States Department of the Interior; and **RYAN
     ZINKE,** Secretary of the Interior,
21
22                                     Defendants.

Case No. _____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

(Administrative Procedure Act,
5 U.S.C. § 551 *et seq.*)

23

24                        **INTRODUCTION**

25        1.    Plaintiffs State of California, by and through Xavier Becerra, Attorney General, and

     the California Air Resources Board, and State of New Mexico, by and through Hector Balderas,
26
     Attorney General ("Plaintiffs") bring this action to challenge the latest decision by the U.S.
27
     Bureau of Land Management, *et al.* ("BLM" or "Defendants") to undermine the Waste
28

                                           1

Prevention Rule—a commonsense measure that would reduce the enormous waste of natural gas on public lands that results from venting, flaring, and equipment leaks.  Defendants have prioritized a negligible increase in oil and gas operators' profits over the public interest in preventing the waste of a public resource that belongs to the American people.  In doing so, Defendants dismiss out of hand the harmful impacts of the thousands of tons of toxic air pollutants and hundreds of thousands of tons of greenhouse gases emitted as a result of operators' inefficient, outdated, and wasteful practices.  BLM's current action—to suspend for one year the compliance dates for key requirements of the Waste Prevention Rule—lacks any reasoned analysis, contravenes BLM's statutory mandates, and ignores significant environmental consequences.  Thus, BLM has violated the Administrative Procedure Act ("APA"), several federal land management statutes, and the National Environmental Protection Act ("NEPA").

2.     BLM, a division of the U.S. Department of the Interior ("DOI"), finalized the Waste Prevention, Production Subject to Royalties and Resource Conservation rule ("Waste Prevention Rule" or "Rule"), on November 18, 2016, after conducting a multi-year stakeholder process and reviewing thousands of public comments.  81 Fed. Reg. 83,008 (Nov. 18, 2016).  The Waste Prevention Rule provides a much-needed update to 38-year-old regulations governing the release of natural gas from new and existing oil and gas operations on federal and Indian lands, and clarifies when gas lost through venting, flaring, or leaks is subject to royalties.  BLM estimated that the Rule would have substantial annual benefits, including producing up to 41 billion cubic feet of additional natural gas, eliminating 175,000–180,000 tons of methane emissions, cutting emissions of volatile organic compounds by 250,000–267,000 tons, reducing toxic air pollutants by 1,860 to 2,030 tons, and generating up to $14 million in additional royalties.  The Rule became effective on January 17, 2017.

3.     On June 15, 2017, BLM published a notice in the Federal Register purporting "to postpone the compliance dates for certain sections of the Rule" pursuant to Section 705 of the APA, 5 U.S.C. § 705.  82 Fed. Reg. 27,430 (June 15, 2017).  Following a legal challenge by Plaintiffs, on October 4, 2017, this district court enjoined BLM's attempt to cut corners in its rush to effectively block the Rule—finding that its summary action purporting to postpone significant

2

compliance dates was not authorized under APA section 705 and was otherwise arbitrary and capricious. *State of California v. U.S. Bureau of Land Mgmt.*, --- F. Supp. 3d ---, 2017 WL 4416409 (N.D. Cal. Oct. 4, 2017) ("*California v. BLM*"), *appeal docketed*, No. 17-17456 (9th Cir. Dec. 4, 2017).

4.     On October 5, 2017, BLM issued a proposal to suspend major impending deadlines and requirements of the Waste Prevention Rule until January 17, 2019, which Plaintiffs opposed in public comments submitted on November 6, 2017.  On December 8, 2017, BLM issued a final rule suspending key requirements of the Waste Prevention Rule.  82 Fed. Reg. 58,050 (Dec. 8, 2017) ("Suspension").  To justify the Suspension, BLM stated it had "concerns regarding the statutory authority, cost, complexity, feasibility, and other implications" of the Rule, and therefore sought to suspend "requirements that may be rescinded or significantly revised in the near future."  *Id*.

5.     Defendants' Suspension of the Waste Prevention Rule's requirements is arbitrary and capricious because the agency attempts to delay and effectively revoke key provisions of the Rule without supplying a reasoned basis for doing so.  Defendants entirely failed to consider how the Suspension would fulfill the important statutory mandates that the Waste Prevention Rule was designed to address, failed to explain why it reversed course based on the same information that it considered when it formulated and promulgated the Rule just a year earlier, and offered a purported justification for the Suspension that runs counter to the evidence before the agency. The Suspension also violates Defendants' statutory mandates to prevent waste and regulate royalties from oil and gas operations on federal and Indian lands, protect the interests of the United States, and to safeguard the public welfare.  Furthermore, Defendants' perfunctory conclusion that the Suspension would result in no significant environmental impacts violates the requirements of NEPA.

6.     Accordingly, Plaintiffs seek a declaration that Defendants' action violated the APA, NEPA, and multiple federal land management statutes, and an injunction requiring Defendants to vacate the Suspension or, in the alternative, vacate the Suspension and immediately reinstate all of the Rule's provisions.

3

**JURISDICTION AND VENUE**

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiffs), and 5 U.S.C. §§ 701–706 (Administrative Procedure Act).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is the judicial district in which Plaintiff State of California resides, and this action seeks relief against federal agencies and officials acting in their official capacities.

**INTRADISTRICT ASSIGNMENT**

9.     Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court.  However, this case is related to Case No. 3:17-cv-03804-EDL, which challenged BLM's illegal attempt to delay the Waste Prevention Rule pursuant to APA Section 705, 5 U.S.C. § 705, and was recently decided in the San Francisco Division.  Pursuant to Civil Local Rule 3-12(b), Plaintiffs intend to promptly file an Administrative Motion to Consider Whether Cases Should Be Related.

**PARTIES**

10.     Plaintiff, STATE OF CALIFORNIA, brings this action by and through Attorney General Xavier Becerra.  The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State.  Cal. Const., art. V, § 13; Cal. Gov. Code §§ 12600-12612.  This challenge is brought in part pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

11.     The California Air Resources Board ("CARB") is a public agency of the State of California within the California Environmental Protection Agency.  The mission of CARB is to promote and protect public health, welfare, and ecological resources of California's citizens through the monitoring and protection of air quality.  CARB's major goals include providing safe,

4

clean air to all Californians, reducing California's emission of greenhouse gases, and providing

leadership and innovative approaches for implementing air pollution controls. In addition to

developing statewide rules, CARB works with local California air districts, many of which

regulate oil and gas pollution at the regional or county level. This action is thus brought, in part,

by the Attorney General at the request of CARB and in the name of the State of California.

12.     California contains millions of acres of federal and tribal lands that are managed by

Defendants for energy production. These lands contain approximately 600 producing oil and gas

leases covering more than 200,000 acres and 7,900 usable oil and gas wells. California is a

leading state in terms of oil extraction on public lands—producing about 15 million barrels

annually—and also produces approximately 7 billion cubic feet of natural gas annually.

13.     Plaintiff STATE OF NEW MEXICO brings this action by and through Attorney

General Hector Balderas. The Attorney General of New Mexico is authorized to prosecute in any

court or tribunal all actions and proceedings, civil or criminal, when, in his judgment, the interest

of the state requires such action. N.M. Stat. Ann. § 8-5-2.

14.     More than one-third of New Mexico's land is federally administered, and New

Mexico is second-highest in the nation in the number of producing oil and natural gas leases on

federal land. Annually, New Mexico produces approximately 1,220 billion cubic feet of natural

gas (of which approximately 60 percent is from federal and Indian lands) and 85,200 million

barrels of crude oil (of which approximately 45 percent is from federal and Indian lands). New

Mexico has the third highest volume of flared oil-well gas among all states.

15.     Plaintiffs have a clear monetary stake in Defendants' decision to suspend certain

provisions of the Waste Prevention Rule. Since 2008, California has received an annual average

of $82.5 million in royalties from federal mineral extraction within the State. Royalties from

federal oil and gas development in California are deposited into the State School Fund, which

supports public education. New Mexico has received an annual average of $470 million in

federal mineral extraction royalties during this same time period. New Mexico, whose per-pupil

education spending is below the national average, uses its federal mineral leasing royalty

payments for educational purposes. One study estimates that New Mexico lost between $39

5

1    million and $46 million in royalties from venting and flaring between 2010 and 2015.  This figure

2    does not include lost royalties from leaks.  Thus, minimizing waste of natural gas in order to

3    maximize royalty recovery in California and New Mexico serves vital societal interests.

4        16.    Plaintiffs further have a strong interest in preventing adverse air quality impacts from

5    the production of fossil fuels in their States.  More than 95 percent of federal drilling in California

6    occurs in Kern County, parts of which are in nonattainment with the 2008 federal 8-hour ozone

7    standard and federal fine particulate matter standards, as well as numerous state ambient air

8    quality standards.  Excess pollution in this part of California—including methane, particulate

9    matter, volatile organic compounds ("VOCs"), and toxic air pollution from the oil and gas

10    industry—significantly increases rates of asthma, heart disease, and lung disease, and raises

11    cancer risk.  While California has state regulations issued by CARB and local air districts, certain

12    provisions of CARB's oil and gas regulation do not require compliance until 2019.  BLM's

13    Suspension of the Waste Prevention Rule will result in the emission, in California, of an

14    estimated 150 tons of VOCs, 4.9 tons of toxic air contaminants, and 70,675 metric tons of carbon

15    dioxide equivalent of methane between January 17, 2018 and January 17, 2019.  The Waste

16    Prevention Rule provides an additional federal layer of regulation and enforcement that addresses

17    the air pollution issues related to oil and gas production on federal and tribal lands within

18    California.

19        17.    In New Mexico, the San Juan Basin in the Four Corners region is the home of the

20    nation's largest methane "cloud," which has been linked to the extensive oil and gas development

21    in that region.  VOC emissions from oil and gas development have led to high ozone

22    concentrations, resulting in an "F" grade for San Juan County from the American Lung

23    Association in 2016.  Because New Mexico represents a disproportionately large share of federal

24    and tribal natural gas emissions, BLM's Suspension of the Rule will result in thousands of

25    additional tons of VOC being emitted in New Mexico.  New Mexico does not have state

26    regulations in place to adequately address venting, flaring, and leaks from oil and gas production.

27        18.    Plaintiffs also have a strong interest in preventing and mitigating harms that climate

28    change poses to human health and the environment, including increased heat-related deaths,

6

1   damaged coastal areas, disrupted ecosystems, more severe weather events, and longer and more

2   frequent droughts. *See Massachusetts v. EPA*, 549 U.S. 497, 521 (2007). Methane is an

3   extremely potent greenhouse gas, with climate impacts roughly 86 times those of carbon dioxide

4   if measured over a 20-year period, or 25 times if measured over a 100-year period.

5         19.    California is already experiencing the adverse effects of climate change, including

6   increased risk of wildfires, a decline in the average annual snowpack that provides approximately

7   35 percent of the State's water supply, increased erosion of beaches and low-lying coastal

8   properties from rising sea levels, and increased formation of ground-level ozone (or smog), which

9   is linked to asthma, heart attacks, and pulmonary problems, especially in children and the elderly.

10  California law establishes targets to reduce the State's greenhouse gas emissions to 1990 levels

11  by 2020 and to 40 percent below 1990 levels by 2030. California has committed to reducing

12  greenhouse gas emissions, including through the development of methane-curbing regulations for

13  oil and gas operations and pipelines.

14        20.    As a state in the arid southwest, New Mexico is also experiencing the adverse effects

15  of climate change and will suffer additional impacts in the future. Average temperatures in New

16  Mexico have been increasing 50 percent faster than the global average over the past century,

17  streamflow totals in the Rio Grande and other rivers in the Southwest are declining, and

18  projections of further reduction of late-winter and spring snowpack pose increased risks to water

19  supplies needed to maintain cities, agriculture, and ecosystems. Further, drought and increased

20  temperatures due to climate change have contributed to extensive tree death across the Southwest.

21        21.    By suspending several provisions of the Waste Prevention Rule, including

22  requirements that operators capture a certain percentage of the gas they produce, measure

23  volumes of flared gas, upgrade or replace equipment, and implement leak detection and repair

24  programs, Defendants' action will adversely impact Plaintiffs by increasing emissions of

25  hazardous air pollutants and greenhouse gases, reducing royalty collections, and wasting fossil

26  fuel resources that belong to the public. Consequently, Plaintiffs have suffered a legal wrong as a

27  result of Defendants' action and have standing to bring this suit.

28

22.    Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency within the United States Department of the Interior that is charged with managing the federal onshore oil and gas program and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

23.    Defendant KATHARINE S. MACGREGOR is the Acting Assistant Secretary for Land and Minerals Management, United States Department of the Interior, and is sued in her official capacity.  Ms. MacGregor signed the Suspension at issue and the Finding of No Significant Impact and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

24.    Defendant RYAN ZINKE is the Secretary of the United States Department of the Interior, and is sued in his official capacity.  Mr. Zinke has responsibility for implementing and fulfilling the duties of the United States Department of the Interior, including the development of fossil fuel resources on public lands, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

**STATUTORY BACKGROUND**

**I.    Federal Land Management Statutes.**

25.    Defendants' duties to minimize waste and to regulate royalties from oil and gas operations on federal and Indian lands are established by several federal statutes.  First, the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. § 181 *et seq*., instructs BLM to require oil and gas lessees to observe "such rules … for the prevention of undue waste as may be prescribed by [the] Secretary," to protect "the interests of the United States," and to safeguard "the public welfare."  *Id*. § 187.  The MLA specifically requires that "[a]ll leases of lands containing oil or gas … shall be subject to the condition that the lessee will … use all reasonable precautions to prevent waste of oil or gas developed in the land … ."  *Id*. § 225.

26.    Pursuant to the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g, and the Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101–08, BLM has authority to regulate oil and gas development on 56 million acres of Indian mineral estate held in trust by the federal government.  *See, e.g.*, 25 U.S.C. § 396d (oil and gas operations on Indian lands subject "to the

8

1    rules and regulations promulgated by the Secretary").  As stated by BLM, the Waste Prevention

2    Rule "helps to meet the Secretary's statutory trust responsibilities with respect to the development

3    of Indian oil and gas interests" because it "will help ensure that the extraction of natural gas from

4    Indian lands results in the payment of royalties to Indian mineral owners, rather than the waste of

5    owners' mineral resources."  81 Fed. Reg. at 83,020.  The Rule also meets these responsibilities

6    because "tribal members and individual Indian mineral owners who live near Indian oil and gas

7    development will realize environmental benefits as a result of this rule's reductions in flaring and

8    air pollution from Indian oil and gas development."  81 Fed. Reg. at 83,021.

9        27.    BLM has authority to regulate royalty payments pursuant to the Federal Oil and Gas

10   Royalty Management Act of 1982 ("FOGRMA"), 30 U.S.C. § 1701 *et seq*.  In FOGRMA,

11   Congress reiterated its concern about waste by providing that: "Any lessee is liable for royalty

12   payments on oil or gas lost or wasted from a lease site when such loss or waste is due to

13   negligence on the part of the operator of the lease, or due to the failure to comply with any rule or

14   regulation, order or citation issued under this chapter or any mineral leasing law."  *Id*. § 1756.

15       28.    The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq*.,

16   provides BLM with broad authority to regulate "the use, occupancy, and development of the

17   public lands" under the principles of "multiple use and sustained yield."  *Id*. § 1732.  Among

18   other requirements, FLPMA mandates that BLM manage public lands "in a manner that will

19   protect the quality of … ecological, environmental, [and] air and atmospheric … values," *id*. §

20   1701(a)(8), and provides that BLM "shall, by regulation or otherwise, take any action necessary

21   to prevent unnecessary or undue degradation of the lands."  *Id*. § 1732(b).

22   **II.    National Environmental Policy Act.**

23       29.    The National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* is the "basic

24   national charter for the protection of the environment."  40 C.F.R. § 1500.1.  The fundamental

25   purposes of the statute are to ensure that "environmental information is available to public

26   officials and citizens before decisions are made and before actions are taken," and that "public

27   officials make decisions that are based on understanding of environmental consequences, and take

28   actions that protect, restore, and enhance the environment."  *Id*. § 1500.1(b)-(c).

9

30.    To achieve these purposes, NEPA requires the preparation of a detailed environmental impact statement ("EIS") for any "major federal action significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  As a preliminary step, an agency may first prepare an environmental assessment ("EA") to determine whether the effects of an action may be significant.  40 C.F.R. § 1508.9.  If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant.  *Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 730 (9th Cir. 2001).  However, an EIS must be prepared if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor."  *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998).

31.    To determine whether a proposed project may significantly affect the environment, NEPA requires that both the context and the intensity of an action be considered.  40 C.F.R. § 1508.27.  In evaluating the context, "[s]ignificance varies with the setting of the proposed action" and includes an examination of "the affected region, the affected interests, and the locality."  *Id*. § 1508.27(a).  Intensity "refers to the severity of impact," and NEPA's implementing regulations list ten factors to be considered in evaluating intensity, including "[u]nique characteristics of the geographic area such as proximity to ... ecologically critical areas," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," and "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration."  *Id*. § 1508.27(b).  The presence of just "one of these factors may be sufficient to require the preparation of an EIS in appropriate circumstances."  *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

III.    The Administrative Procedure Act.

32.    The Administrative Procedure Act, 5 U.S.C. § 551 *et seq*., governs the procedural requirements for agency decision-making, including the agency rule making process.  Under the APA, a "reviewing court shall…hold unlawful and set aside" agency action found to be "arbitrary,

10

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. If an agency reverses course by suspending a fully-promulgated regulation, it is "obligated to supply a reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 42 (1983). Further, an agency must show that "there are good reasons" for the reversal. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* Moreover, an agency cannot suspend a validly promulgated rule without first "pursu[ing] available alternatives that might have corrected the deficiencies in the program which the agency relied upon to justify the suspension." *Public Citizen v. Steed*, 733 F.2d 93, 103 (D.C. Cir. 1984).

33.     Prior to formulating, amending, or repealing a rule, agencies must engage in a notice-and-comment process. 5 U.S.C. §§ 551(5), 553. Notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b). To satisfy the requirements of APA Section 553(b), notice of a proposed rule must "provide an accurate picture of the reasoning that has led the agency to the proposed rule," so as to allow an "opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules." *Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 528-30 (D.C. Cir. 1982). The public may then submit comments which the agency must consider before promulgating a final rule. *Id.* § 553(c). This process is designed to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.*

## FACTUAL AND PROCEDURAL BACKGROUND

34.     BLM oversees more than 245 million acres of land and 700 million subsurface acres of federal mineral estate, on which reside nearly 100,000 producing onshore oil and gas wells. 81 Fed. Reg. at 83,014. In fiscal year 2015, the production value of this oil and gas exceeded $20 billion and generated over $2.3 billion in royalties which were shared with tribes and states. *Id.*; *see* 30 U.S.C. § 191(a).

35.    Oil and gas production in the United States has increased dramatically over the past decade due to technological advances such as hydraulic fracturing and directional drilling. 81 Fed. Reg. at 83,009.  However, the American public has not fully benefitted from this increase in domestic energy production because it "has been accompanied by significant and growing quantities of wasted natural gas."  81 Fed. Reg. at 83,014.  For example, between 2009 and 2015, nearly 100,000 oil and gas wells on federal land vented or flared enough gas to serve about 6.2 million households for a year.  81 Fed. Reg. at 83,009.  In 2014 alone, operators vented and flared approximately 4.1 percent of the total production from BLM-administered leases, or enough natural gas to supply 1.5 million households for a year.  81 Fed. Reg. at 83,010.

36.    Prior to 2016, BLM's regulatory scheme governing the minimization of resource waste had not been updated in over three decades.  81 Fed. Reg. at 83,008.  Several oversight reviews, including those by the Government Accountability Office ("GAO") and the Department of the Interior's Office of the Inspector General, specifically called on BLM to update its "insufficient and outdated" regulations regarding waste and royalties.  81 Fed. Reg. at 83,009-10. The reviews recommended that BLM require operators to augment their waste prevention efforts and clarify policies regarding royalty-free, on-site use of oil and gas.  *Id.*

37.    In 2014, BLM responded to these reports by initiating the development of a rule to update its existing regulations on these issues.  *Id.*  After soliciting and reviewing input from stakeholders and the public, BLM released its proposal in February 2016.  81 Fed. Reg. 6,616 (Feb. 8, 2016) ("Proposed Rule").  BLM received approximately 330,000 public comments, including approximately 1,000 unique comments, on the Proposed Rule.  81 Fed. Reg. at 83,021. The agency also hosted stakeholder meetings and met with regulators from states with significant federal oil and gas production.  *Id.*

38.    BLM issued the final Waste Prevention Rule in November 2016.  81 Fed. Reg. at 83,008.  In the final Rule, BLM refined many of the provisions of the Proposed Rule based on public comments to ensure both that compliance was feasible for operators and that the Rule achieved its waste prevention objectives.  81 Fed. Reg. at 83,022–23.

39.    The Rule addresses each major source of natural gas waste from oil and gas production—venting, flaring, and equipment leaks—through different requirements.  81 Fed. Reg. at 83,010–13.  In particular, the Rule prohibits venting except under specified conditions, and requires updates to existing equipment.  81 Fed. Reg. at 83,011–13.  The Rule's flaring regulations reduce waste by requiring gas capture percentages that increase over time, providing exemptions that are scaled down over time, and requiring operators to submit Waste Minimization Plans.  81 Fed. Reg. at 83,011.  Leak detection provisions require semi-annual inspections for well sites and quarterly inspections for compressor stations.  *Id*.

40.    In promulgating the Rule, BLM stated that it was advancing the mandates placed on the agency by Congress to oversee federal oil and gas activities, and to ensure that lessees use all reasonable precautions to prevent waste of public resources.  81 Fed. Reg. at 83,009.

41.    BLM determined that the Rule's benefits outweighed its costs "by a significant margin."  81 Fed. Reg. at 83,014.  BLM measured the benefits of the Rule by considering "the cost savings that the industry would receive from the recovery and sale of natural gas and the environmental benefits of reducing the amount of methane (a potent GHG) and other air pollutants released into the atmosphere."  *Id*.  BLM estimated that the Rule would result in monetized benefits of $209–$403 million annually, including the monetized benefits of reducing methane emissions by roughly 35 percent, and would improve air quality and overall quality of life for residents living near oil and gas wells.  *Id*.  The Rule's costs, on the other hand, would be minimal—between $114 and $275 million per year industry-wide—which even for small operators would result in an average reduction in profit margin of just 0.15 percentage points. 81 Fed. Reg. at 83,013–14.  BLM acknowledged that these cost estimates could be overstated because they did not take into account operators that were already in compliance with the requirements of the Rule.  81 Fed. Reg. at 83,013.

42.    The Rule was immediately challenged by two industry groups and the States of Wyoming and Montana (later joined by North Dakota and Texas) (collectively, "Petitioners") in federal district court in Wyoming, on the alleged basis that BLM did not have statutory authority to regulate air pollution and that the Rule was arbitrary and capricious.  *Western Energy Alliance*

13

*v. Jewell*, No. 2:16-cv-00280-SWS (D. Wyo. petition filed Nov. 16, 2016); *State of Wyoming v. Jewell*, No. 2:16-cv-00285-SWS (D. Wyo. petition filed Nov. 18, 2016) (collectively, the "Wyoming Litigation").  The industry groups and several states then moved for a preliminary injunction.  The California Attorney General's Office, on behalf of the California Air Resources Board, and the State of New Mexico, intervened in December 2016 on the side of BLM to defend the Rule.  Several environmental organizations also intervened on the side of BLM to defend the Rule.  On January 16, 2017, the Wyoming district court denied Petitioners' motions for a preliminary injunction, finding that Petitioners had failed to establish a likelihood of success on the merits or irreparable harm in the absence of an injunction.

43.    The Rule became effective on January 17, 2017.

44.    On March 28, 2017, President Donald Trump issued Executive Order 13783, entitled "Promoting Energy Independence and Economic Growth."  82 Fed. Reg. 16,093 (Mar. 31, 2017).  Section 7 of that Executive Order, entitled "Review of Regulations Related to United States Oil and Gas Development," specifically called on the Secretary of the Interior to review and "as soon as practicable, suspend, revise, or rescind" the Waste Prevention Rule.

45.    The following day, Secretary of the Interior Ryan Zinke issued Secretarial Order 3349, which provided that within 21 days, BLM would review the Rule and issue an internal report as to "whether the rule is fully consistent with the policy set forth in Section 1 of the March 28, 2017 E.O."  BLM published the results of its review on October 24, 2017.  *See* 82 Fed. Reg. 50,540 (Nov. 1, 2017).  This review consists of less then a single page where BLM concludes, without any rationale or justification, that "the 2016 final rule poses a substantial burden on industry, particularly those requirements that are set to become effective on January 17, 2018."

46.    Various states and industry groups also lobbied members of Congress to repeal the Waste Prevention Rule using the Congressional Review Act.  On May 10, 2017, the United States Senate voted to reject such a measure, leaving the Rule in effect.

47.    On June 15, 2017, BLM published a notice in the Federal Register purporting to postpone certain compliance dates of the Rule subject to APA Section 705.  82 Fed. Reg. 27,430 ("Postponement Notice").  The States of California and New Mexico challenged this unlawful

14

action on July 5, 2017 in the U.S. District Court for the Northern District of California.  On

October 4, 2017, the court ruled that Section 705 did not apply to an already-effective rule, and

that the postponement amounted to a rulemaking that required compliance with the APA's notice

and comment procedures.  The Court also found that BLM's failure to consider the benefits of

compliance with the provisions that were postponed rendered their action arbitrary and capricious

and in violation of the APA.  Thus, the court vacated the Postponement Notice and the Rule went

back into effect.  On December 4, 2017, BLM filed a notice of appeal.

48.     On October 5, 2017, BLM published a notice in the Federal Register proposing to

delay and suspend key requirements of the Rule that were already in effect, or set to take effect in

January 2018, until January 17, 2019.  82 Fed. Reg. 46,458 (Oct. 5, 2017) ("Proposed

Suspension").  These requirements include those covered by the Postponement Notice, as well as

already-effective provisions governing waste minimization plans, well drilling, well completion

and related operations, and downhole well maintenance and liquids unloading.

49.     BLM's stated rationale for the Proposed Suspension was that it was "currently

reviewing the 2016 final rule and want[ed] to avoid imposing temporary or permanent

compliance costs on operators for requirements that may be rescinded or significantly revised in

the near future."  *Id*.  However, BLM provided no justification regarding how the Proposed

Suspension would fulfill its statutory mandates to prevent waste, ensure the adequate payment of

royalties, protect the interests of the United States or public welfare, or meet its statutory trust

responsibilities on tribal lands.  To the contrary, BLM admitted that the benefits of the Rule in

reducing waste, increasing royalty payments, and cutting air pollution and greenhouse gas

emissions would not be achieved.  82 Fed. Reg. at 46,464-65 ("BLM's proposed rule would

temporarily suspend or delay almost all of the requirements in the 2016 final rule that we

estimated would generate benefits of gas savings or reductions in methane emissions.").

50.     BLM prepared a Regulatory Impact Analysis for the Proposed Suspension.

Regulatory Impact Analysis for the Proposed Suspension Rule (Sept. 27, 2017) ("Proposed

RIA").  Rather than considering substantive amendments to the Rule that could have addressed

1   BLM's purported concerns, the only alternatives to the one-year extension that BLM considered

2   were suspensions of other lengths (six months and two years).  *Id*. at 48-49.

3       51.    The public was permitted 30 days to submit comments, and no public hearing was

4   held.  *Id*.  The States of California and New Mexico, by and through their Attorneys General,

5   commented in opposition to the Proposed Suspension.  The California Air Resources Board also

6   submitted comments in opposition to the Proposed Suspension.  On October 20, 2017, while the

7   public comment period was ongoing, BLM represented to the court in the Wyoming Litigation

8   that: "Once the Suspension Rule is completed, it will provide the immediate relief sought by

9   Petitioners—relief from the portions of the Waste Prevention Rule that would otherwise come

10  into effect on January 17, 2018, as well as other provisions of the Waste Prevention Rule already

11  in effect—and thereby obviate the need for immediate judicial review of the Waste Prevention

12  Rule."  Wyoming Litigation, Fed. Mot. to Extend Briefing Deadlines (Dkt. No. 155) at 4.

13      52.    On December 8, 2017, BLM issued a final rule suspending key requirements of the

14  Waste Prevention Rule until January 17, 2019.  82 Fed. Reg. 58,050 (Dec. 8, 2017)

15  ("Suspension").  To justify the Suspension, BLM stated it had "concerns regarding the statutory

16  authority, cost, complexity, feasibility, and other implications" of the Rule, and therefore sought

17  to "avoid imposing likely considerable and immediate compliance costs on operators for

18  requirements that may be rescinded or significantly revised in the near future."  *Id*.  The

19  Suspension also makes reference BLM's "initial review" of the Rule conducted pursuant to

20  Executive Order 13783 and Secretarial Order No. 3349, which allegedly uncovered a "newfound

21  concern" regarding the Rule's burdens on operators of marginal or low-producing wells.  *Id*.  The

22  Suspension further references Executive Order 13371, entitled "Reducing Regulatory and

23  Controlling Regulatory Costs," although BLM does not indicate how the Suspension fulfills the

24  direction of this order.  *Id*.  BLM acknowledged that the Suspension "suspends or delays almost

25  all of the requirements in the 2016 final rule that we estimated would…generate benefits of gas

26  savings or reductions in methane emissions."  *Id*. at 58,056.  BLM also stated that although it "is

27  currently considering revisions to the 2016 final rule, it cannot definitively determine what form

28

Complaint for Declaratory and Injunctive Relief  (Case Number to be Determined)

1    those revisions will take until it completes the notice-and-comment rulemaking process." *Id*. at

2    58,061.

3         53.    On December 12, 2017, BLM released a final regulatory impact analysis for the

4    Suspension ("Final RIA") that did not change materially from the Proposed RIA. *See* U.S.

5    Bureau of Land Management, Regulatory Impact Analysis for the Final Rule to Suspend or Delay

6    Certain Requirements of the 2016 Waste Prevention Rule ("Final RIA"). The Final RIA states

7    that it "draws heavily upon the analysis conducted for the RIA for the 2016 final rule," Final RIA

8    at 5, although it makes dramatic changes in calculating the costs of increased methane emissions

9    by relying on an "interim" measure that only considers "the domestic social cost of methane." *Id*.

10   at 33-35. This interim measure lacks substantial analysis, much less peer review, and ignores

11   nearly ninety-percent of the costs imposed by methane emissions. Further, despite the

12   Suspension's justification of avoiding compliance costs for operators, the Final RIA states that

13   such costs would be insignificant and that the Suspension would increase the profit margin for the

14   smallest operators by just 0.17 percentage points. *Id*. at 61. BLM also determined that the

15   Suspension "would not have a significant impact" on small companies, and that it would not

16   "significantly impact the supply, distribution, or use of energy." *Id.* at 55, 67. Also, contrary to

17   BLM's stated justification for the Suspension, the Final RIA calculates costs and benefits based

18   on an assumption that the Rule will go into effect, unaltered and in its entirety, on January 17,

19   2019. *Id*. at 27-39. Finally, BLM bases its estimates of industry cost savings on the unfounded

20   assumption that oil and gas operators have not already undergone compliance activities to meet

21   the January 17, 2018 deadlines. *Id.* at 33.

22         54.    BLM also issued a Final Environmental Assessment ("Final EA") and Finding of No

23   Significant Impact ("FONSI") for the Suspension, which determined that the Suspension "would

24   not have a significant effect on the quality of the human environment; therefore, an EIS is not

25   required." The FONSI, like the Final RIA, relies on the premise that the Rule will be

26   implemented completely on January 17, 2019. *See* FONSI at 5 ("While a delay in implementing

27   the rule would postpone any anticipated reductions, delaying the rule would not result in an

28   increase of GHG, air pollutant, and HAP emissions over current conditions.").

17

1    55.   On December 11, 2017, BLM moved to dismiss or stay the Wyoming Litigation based

2    on the Suspension and its ongoing reconsideration of the Rule.

3                                **FIRST CAUSE OF ACTION**

4                           **(Violation of the APA, 5 U.S.C. § 706)**

5    56.   Paragraphs 1 through 55 are realleged and incorporated herein by reference.

6    57.   An agency action is arbitrary and capricious under the APA where the agency (i) has

7    relied on factors which Congress has not intended it to consider; (ii) entirely failed to consider an

8    important aspect of the problem; (iii) offered an explanation for its decision that runs counter to

9    the evidence before the agency; or (iv) is so implausible that it could not be ascribed to a

10   difference of view or the product of agency expertise. *State Farm*, 463 U.S. at 43.  Moreover, an

11   "agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the

12   change." *State Farm*, 463 U.S. at 42.  "[E]ven when reversing a policy after an election, an

13   agency may not simply discard prior factual findings without a reasoned explanation." *Organized*

14   *Village of Kake v. U.S. Dept. of Agriculture*, 795 F.3d 956, 968 (9th Cir. 2015).  Moreover, an

15   agency cannot suspend a validly-promulgated rule without first "pursu[ing] available alternatives

16   that might have corrected the deficiencies in the program which the agency relied upon to justify

17   the suspension." *Public Citizen v. Steed*, 733 F.2d 93, 103 (D.C. Cir. 1984).

18   58.   Here, Defendants have failed to provide an explanation for suspending the Waste

19   Prevention Rule based on the same factual record that was before the agency during the multi-

20   year rulemaking proceeding that resulted in the adoption of the Rule.  Defendants also entirely

21   failed to consider how the Suspension will achieve their statutory mandates to prevent waste,

22   ensure the adequate payment of royalties, protect the interests of the United States and public

23   welfare, or fulfill its statutory trust responsibilities on tribal lands.

24   59.   Defendants' stated justification of avoiding compliance costs for operators is

25   contradicted by its own findings that these compliance costs represent just a fraction of a percent

26   of the profit margins for even the smallest operators.

27   60.   Defendants' citation to Executive Order 13783 and Secretarial Order 3349 to justify

28   the Suspension is inconsistent with their admission that the Suspension will have almost no

1   impact on operator compliance costs or energy development on federal or Indian lands.  Further,

2   these Executive Orders cannot contravene statutory mandates imposed upon Defendants by

3   Congress.

4        61.   Defendants' reliance on the Final RIA is also arbitrary and capricious for several

5   reasons, including its assumptions that the Waste Prevention Rule will take full effect in January

6   2019 and that operators have not already incurred costs to comply with the requirements affected

7   by the Suspension, its use of an "interim" domestic social cost of methane measure, and its failure

8   to consider the full costs of the Suspension.

9        62.   Finally, Defendants failed to consider alternative solutions to address any alleged

10   deficiencies with the Rule, such as through the issuance of guidance or making adjustments

11   necessary to clarify certain provisions, rather than a suspension of the Rule's key requirements.

12        63.   Accordingly, Defendants acted in a manner that was arbitrary, capricious, an abuse of

13   discretion, not in accordance with law, and in excess of their statutory authority.  5 U.S.C. § 706.

14   Consequently, the Suspension should be held unlawful and set aside.

15                          **SECOND CAUSE OF ACTION**

16                  **(Violation of the MLA, FOGRMA, FLPMA and the APA;**

17       **30 U.S.C. §§ 187, 225; 30 U.S.C. § 1756; 43 U.S.C. §§ 1701, 1732; 5 U.S.C. § 706)**

18        64.   Paragraphs 1 through 63 are realleged and incorporated herein by reference.

19        65.   The MLA vests BLM with broad responsibility to require oil and gas lessees to

20   observe "such rules … for the prevention of undue waste as may be prescribed by [the]

21   Secretary," to protect "the interests of the United States," and to safeguard "the public welfare."

22   30 U.S.C. § 187.  The MLA also requires that "[a]ll leases of lands containing oil or gas … shall

23   be subject to the condition that the lessee will … use all reasonable precautions to prevent waste

24   of oil or gas developed in the land … ."  *Id*. § 225.

25        66.   FOGRMA provides that, "Any lessee is liable for royalty payments on oil or gas lost

26   or wasted from a lease site when such loss or waste is due to negligence on the part of the

27   operator of the lease, or due to the failure to comply with any rule or regulation, order or citation

28   issued under this chapter or any mineral leasing law."  30 U.S.C. § 1756.

67.   FLPMA mandates that BLM manage public lands "in a manner that will protect the quality of … ecological, environmental, [and] air and atmospheric … values," 43 U.S.C. § 1701(a)(8), and provides BLM with authority to take any action, by regulation or otherwise, "necessary to prevent unnecessary or undue degradation of the lands." *Id*. § 1732(b).

68.   In promulgating the Suspension, Defendants entirely failed to consider or fulfill their statutory trust responsibilities or mandates to prevent waste of oil and gas, to protect the interests of the United States and safeguard the public welfare, and otherwise ensure the environmentally responsible development of oil and gas on public lands.

69.   Accordingly, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of their statutory authority, in violation of the FOGRMA, FLPMA, MLA and APA.  30 U.S.C. §§ 187, 225; 30 U.S.C. § 1756; 43 U.S.C. §§ 1701, 1732; 5 U.S.C. § 706.  Consequently, the Suspension should be held unlawful and set aside.

### THIRD CAUSE OF ACTION

### (Violation of NEPA and the APA;

### 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3; 5 U.S.C. § 706)

70.   Paragraphs 1 through 69 are realleged and incorporated herein by reference.

71.   NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed activity before taking action.  *See* 42 U.S.C. § 4332.  To achieve this purpose, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  *Id*. § 4332(2)(C); 40 C.F.R. § 1502.3.  To determine whether a federal action will result in significant environmental impacts, the federal agency may first conduct an EA.  40 C.F.R. §§ 1501.4, 1508.9.  An EA must include a discussion of the need for the proposal, alternatives to the proposed action, the environmental impacts of the proposed action and alternatives, and must provide "sufficient evidence and analysis for determining whether to prepare" an EIS or a FONSI.  *Id*. § 1508.9.

72.   NEPA's implementing regulations specify several factors that an agency must consider in determining whether an action may significantly affect the environment, thus warranting the preparation of an EIS.  40 C.F.R. § 1508.27.  The presence of any single

20

significance factor can require the preparation of an EIS.  "The agency must prepare an EIS if substantial questions are raised as to whether a project may cause significant environmental impacts."  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir. 2014).

73.    As the comment letters from Plaintiffs, as well as BLM's own analysis, demonstrate, there are substantial questions, if not certainties, as to whether the Suspension may have significant environmental impacts.  In particular, the Suspension will result in significant adverse impacts including increased air pollution and related public health impacts, climate change harms, and increased visual and noise impacts from venting, flaring or leaking billions of cubic feet of natural gas.

74.    Defendants' determination that the Suspension would result in no significant impacts, and its reliance on a FONSI and failure to prepare an EIS, constitutes agency action unlawfully or unreasonably withheld or delayed, in violation of the requirements of NEPA.  5 U.S.C. § 706(1). Alternatively, Defendants' determination that the Suspension would result in no significant impacts, and its reliance on a FONSI and failure to prepare an EIS, is arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA.  5 U.S.C. § 706(2).

## FOURTH CAUSE OF ACTION

### (Violation of the APA, 5 U.S.C. §§ 553(b), 706)

75.    Paragraphs 1 through 74 are realleged and incorporated herein by reference.

76.    The Proposed Suspension provided no explanation as to why certain provisions of the Waste Prevention Rule might no longer be valid or prudent, and no data to support such purported deficiencies.  *See* 5 U.S.C. § 553.  Further, Defendants' statements indicate that BLM had already made up its mind to finalize the Suspension prior to considering public comments.  Defendants therefore "did not provide a meaningful opportunity for comment, and did not solicit or receive relevant comments regarding the substance or merits of either set of regulations."  *N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012).  Hence, the public has not had an opportunity to "participate in the rule making through submission of written data, views, or arguments…on the relevant matter presented," as required by the APA.  5 U.S.C. § 553(c).

77.     Accordingly, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of their statutory authority, and the Suspension should be held unlawful and set aside.  5 U.S.C. §§ 553, 706.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Issue a declaratory judgment that Defendants acted arbitrarily, capriciously, contrary to law, abused their discretion, and failed to follow the procedure required by law in their promulgation of the Suspension, in violation of the MLA, FOGRMA, FLPMA, NEPA, and the APA;

2.     Vacate the Suspension;

3.     Issue a mandatory injunction compelling Defendants to reinstate the Waste Prevention Rule in its entirety;

4.     Award Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

5.     Award such other relief as the Court deems just and proper.

1    Dated:  December 19, 2017                           Respectfully Submitted,

2                                                        XAVIER BECERRA
                                                         Attorney General of California
3                                                        DAVID A. ZONANA
                                                         Supervising Deputy Attorney General
4
                                                         /s/ Mary S. Tharin
5                                                        MARY S. THARIN
                                                         GEORGE TORGUN
6                                                        Deputy Attorneys General

7                                                        *Attorneys for Plaintiff*
                                                         *State of California, by and through Xavier*
8                                                        *Becerra, Attorney General, and the*
                                                         *California Air Resources Board*
9

10                                                       HECTOR BALDERAS
                                                         Attorney General of New Mexico
11
                                                         /s/ Ari Biernoff
12                                                       ARI BIERNOFF
                                                         BILL GRANTHAM
13                                                       Assistant Attorneys General

14                                                       *Attorneys for Plaintiff*
                                                         *State of New Mexico, by and through Hector*
15                                                       *Balderas, Attorney General*

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief  (Case Number to be Determined)