UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>               Plaintiffs,<br><br>     v.<br><br>BUREAU OF LAND MANAGEMENT, et al.,<br><br>               Defendants. | Case Nos. 17-cv-07186-WHO;<br>17-cv-07187-WHO<br><br>**ORDER DENYING MOTION TO TRANSFER VENUE AND GRANTING PRELIMINARY INJUNCTION** |
| SIERRA CLUB, et al.,<br><br>               Plaintiffs,<br><br>     v.<br><br>RYAN ZINKE, in his official capacity as Secretary of the Interior, et al.,<br><br>               Defendants. | |

## INTRODUCTION

This case addresses the burden a federal agency bears when it seeks to suspend a federal regulation for further analysis. Plaintiffs, the States of California and New Mexico, bring this action for a preliminary injunction enjoining the United States Bureau of Land Management ("BLM"), Katherine S. Macgregor, Acting Assistant Secretary for Land and Minerals Management, and Ryan Zinke, Secretary of the Interior, from instituting a rule suspending or delaying the requirements of the Waste Prevention, Production Subject to Royalties, and Resource Conservation Rule. A coalition of 17 conservation and tribal citizen groups separately brought

suit for a preliminary injunction against Zinke, the BLM, and the United States Department of the Interior seeking the same preliminary injunction. These two cases have been consolidated for review.

The States of North Dakota and Texas, along with three industry groups, the Western Energy Alliance ("WEA"), Independent Petroleum Association of America ("IPAA"), and American Petroleum Institute ("API"), have moved to intervene in these consolidated actions in opposition to the preliminary injunction. The BLM and the States of North Dakota and Texas have also moved to transfer venue of this case to the District of Wyoming, where a case challenging the underlying rule is pending.[1]

First, I deny the motion to change venue. As discussed below, the legal issues concerning the Waste Prevention Rule in the District of Wyoming go to the substance of that regulation; this lawsuit addresses the BLM's alleged procedural failure to justify a different rule, the Suspension Rule. The legal issues are distinct. In light of plaintiffs' choice of forum, venue is appropriate here.

Second, I grant Plaintiffs' motion for a preliminary injunction. The BLM's reasoning behind the Suspension Rule is untethered to evidence contradicting the reasons for implementing the Waste Prevention Rule, and so plaintiffs are likely to prevail on the merits. They have shown irreparable injury caused by the waste of publicly owned natural gas, increased air pollution and associated health impacts, and exacerbated climate impacts. Plaintiffs are entitled to a preliminary injunction on this record.

**BACKGROUND**

On November 18, 2016, after three years of development, the BLM published the final version of its regulations intended "to reduce waste of natural gas from venting, flaring, and leaks during oil and natural gas production activities on onshore Federal and Indian (other than Osage Tribe) leases." *See* "Waste Prevention, Production Subject to Royalties, and Resource

---

[1] "Plaintiffs" refers to the States of California and New Mexico as well as all 17 conservation and tribal citizen groups collectively. "BLM" refers to the named government defendants in both actions. "Defendants" refers to the named defendants in both actions as well as the proposed intervenors collectively.

Conservation:  Final Rule," 81 Fed. Reg. 83,008 (Nov. 18, 2016) ("Waste Prevention Rule").  The Waste Prevention Rule became effective on January 17, 2017, with many of its requirements to be phased in over time up until January 17, 2018.

In November of 2016, two industry groups, the Western Energy Alliance and the Independent Petroleum Association of America, as well as the states of Wyoming and Montana, separately filed lawsuits challenging the Waste Prevention Rule and seeking a preliminary injunction in the U.S. District Court for the District of Wyoming.  *See W. Energy All. v. Zinke*, No. 16-cv-0280 (D. Wyo. filed Nov. 15, 2016); *Wyoming v. U.S. Dep't of Interior*, No. 16-cv-0285 (D. Wyo. filed Nov. 18, 2016).  The two cases were consolidated, and the states of California and New Mexico, as well as a coalition of environmental groups, including all but one of the plaintiffs in this action, intervened in the lawsuits on the side of the government.  The States of North Dakota and Texas intervened on the side of the petitioners.  On January 16, 2017, the court denied the motions for preliminary injunction.  *See Wyoming v. U.S. Dep't of Interior*, Nos. 16-cv-0285, 16-cv-0280, 2017 WL 161428 (D. Wyo. Jan. 16, 2017).

On March 28, 2017, President Trump issued an Executive Order requiring the Secretary of the Interior to review the Waste Prevention Rule.  Exec. Order No. 13,783, 82 Fed. Reg. 16,093, § 7(b) (Mar. 28, 2017).  BLM reviewed the rule and drafted a proposed Revision Rule rescinding certain provisions of the Waste Prevention Rule and substantially revising others.  BLM published the proposed rule in the Federal Register today, after conclusion of its review by the Office of Information and Regulatory Affairs.  *See* "Waste Prevention, Production Subject to Royalties, and Resource Conservation:  Rescission or Revision of Certain Requirements," 83 Fed. Reg. 7924 (proposed Feb. 22, 2018).

In the interim, BLM developed a rule to delay for one year the effective date of the provisions of the Waste Prevention Rule that had not yet become operative and suspend for one year the effectiveness of certain provisions already in effect ("Suspension Rule").[2]  82 Fed. Reg.

---

[2] The parties have used various naming conventions in reference to the Waste Prevention Rule and the Suspension Rule.  They shall adopt these two naming conventions for purposes of this litigation.

58,050, 58,051 (Dec. 8, 2017). BLM published the proposed Suspension Rule on October 5, 2017, and on December 8, 2017, published the final Suspension Rule. *See* 82 Fed. Reg. 46,458, 58,050. It took effect on January 8, 2018. The rule temporarily suspended or delayed certain requirements at the heart of the pending *Wyoming* litigation.

Plaintiffs in this action filed suit challenging the Suspension Rule on December 18, 2017, and moving for a preliminary injunction. *California v. BLM*, No. 17-cv-07186 (N.D. Cal. filed Dec. 19, 2017); *Sierra Club v. Zinke*, No. 17-cv-07187 (N.D. Cal. filed Dec. 19, 2017). On December 29, 2017, the court in the *Wyoming* cases stayed those cases in light of the Suspension Rule and BLM's continued efforts to revise the Waste Prevention Rule, as well as the present lawsuits, which raise procedural challenges to the Suspension Rule and seek to reinstate the Waste Prevention Rule. *Wyoming*, Nos. 16-cv-0280, 16-cv-0285 (D. Wyo. Dec. 29, 2017) [Dkt. Nos. 184, 189]. In that decision, the court explained that "it is fair to say those actions are inextricably intertwined with the cases before this Court and with the ultimate rules to be enforced." *Id.* at 4.

## LEGAL STANDARD

### I.     Transfer of Venue

A court may transfer an action to another district "where it might have been brought" "[f]or the convenience of the parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). A motion for transfer lies within the broad discretion of the district court and must be determined on an individualized basis. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000). Section 1404(a) requires the court to make a threshold determination of whether the case could have been brought where the transfer is sought. If venue is appropriate in the alternative venue, the court must weigh the convenience of the parties, the convenience of the witnesses, and the interest of justice. *See* 28 U.S.C. § 1404(a). In making its determination, the court may consider several factors, including: "(1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of

unwilling non-party witnesses, and (8) the ease of access to sources of proof." *Jones*, 211 F.3d at 498–99.

"The burden is on the party seeking transfer to show that when these factors are applied, the balance of convenience clearly favors transfer." *Lax v. Toyota Motor Corp.*, 65 F. Supp. 3d 772, 776 (N.D. Cal. 2014) (citing *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979)). "The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

## II.        Preliminary Injunction

In order to obtain a preliminary injunction, a plaintiff must demonstrate four factors: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). While this is a four-part conjunctive test, the Ninth Circuit has held that a plaintiff may also obtain an injunction if it has demonstrated "serious questions going to the merits," that the balance of hardship "tips sharply" in its favor, that it is likely to suffer irreparable harm, and that an injunction is in the public interest. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## DISCUSSION

## I.        Motion to Transfer Venue

The parties do not dispute that the District of Wyoming is a proper venue where this action could have been brought. Instead, they dispute how the convenience and interest of justice factors should be weighed. For the following reasons, I conclude that Defendants have not met their burden to show that the balance of all of the relevant factors clearly favors transfer such that I should upset Plaintiffs' choice of forum in this district.

### A.        Convenience of the Parties and Witnesses

Defendants' primary argument in support of the "convenience" factors is that litigating this

case in the District of Wyoming would be more convenient because it would allow both the preceding *Wyoming* cases and this action to be litigated "in a coordinated fashion." *See Elecs. for Imaging, Inc. v. Tesseron, Ltd.*, No. 07-cv-05534 CRB, 2008 WL 276567, at *2 (N.D. Cal. Jan. 29, 2008). They point to *Electronics for Imaging*, in which a lawsuit was filed in the District of Ohio raising a patent infringement claim based on two patents. One of the defendants in that action filed a second suit in the Northern District of California for declaratory relief, seeking to determine its rights to those two (among other) patents. The Hon. Charles R. Breyer transferred the second suit to the District of Ohio, reasoning that "the pertinent question is not simply whether *this* action would be more conveniently litigated in Ohio than California, but whether it would be more convenient to litigate the California and Ohio actions separately or in a coordinated fashion." *Id.*

Those two cases each raised the issue of the parties' rights under the same two patents. This matter shares no identical issues with the *Wyoming* cases. It is true that the cases pertain to related rules, but the legal issues are distinct. *Wyoming* concerns a challenge to the Waste Prevention Rule in which the petitioners argue that BLM exceeded its authority by impermissibly encroaching on both the EPA's authority to regulate air pollution and states' regulatory authority over certain state lands, as well as that the Waste Prevention Rule is arbitrary and capricious because its cost-benefit analysis takes into consideration air pollution benefits rather focusing on waste prevention. The matter here deals with the procedural propriety of the Suspension Rule under the APA, and whether the Suspension Rule is arbitrary and capricious because, among other reasons, it does not provide the requisite detailed justification for relying on inconsistent and contradictory facts to its prior findings. This matter does not deal with any issues regarding BLM's authority to regulate air pollution, as is the focus of the *Wyoming* litigation. As the cases share no identical legal issues, there is no substantial convenience in litigating them "in a coordinated fashion" as there was in *Electronics for Imaging*. While the disposition of this matter may affect the proceedings in the *Wyoming* cases, the court's issuance of the stay in that litigation ensures that the *Wyoming* court is not wasting judicial resources or coming to a premature decision pending the outcome of this litigation.

Defendants' remaining contentions in support of the convenience factors amount to arguments that Plaintiffs cannot show that the Northern District of California is a more convenient forum. That is not Plaintiffs' burden. Defendants must show that the convenience of the parties and the witnesses favors the District of Wyoming. Defendants assert that Plaintiffs' California connections are limited and tempered by their voluntary participation in the *Wyoming* litigation, that the Northern District of California is less convenient for Defendants than the District of Wyoming, and that Wyoming has just as much interest in and ties to these cases as California. Defendants' first and third points are true but not relevant to the question of convenience. That most of the plaintiffs in this matter are litigating a case in the District of Wyoming does not somehow mean that litigating a second case there is not an additional burden or inconvenience to them. Defendants' arguments boil down to the District of Wyoming being more convenient for themselves only, due to the cost of litigating a second set of cases in this district. The transfer of venue, however, "would merely shift rather than eliminate the inconvenience" from Defendants to Plaintiffs. *Decker Coal*, 805 F.2d at 843. This is insufficient to show that the convenience of the parties and witnesses weighs in favor of transferring the case to the District of Wyoming.

**B. Interest of Justice**

Defendants argue that the interest of justice heavily favors transfer of these cases because of the strong interest in having a single court review issues arising out of the same rulemaking, emphasizing the District of Wyoming's familiarity with the Waste Prevention Rule. They urge the court to focus its attention on this analysis because "[t]he question of which forum will better serve the interest of justice is of predominant importance on the question of transfer, and factors involving convenience of parties and witnesses are in fact subordinate." *Wireless Consumers All., Inc. v. T-Mobile USA, Inc.*, No. 03-cv-3711-MHP, 2003 WL 22387598, at *4 (N.D. Cal. Oct. 14, 2003). In opposition, Plaintiffs argue that Defendants mischaracterize the relationship between the two actions, and that none of the legal issues before the *Wyoming* court are before this one.

As discussed above, this case and the *Wyoming* litigation involve separate legal issues. That the subject matter at the heart of both of these actions is the same is hardly grounds for transfer. Indeed, many cases may arise from a single rule or statute. But Section 1404(a) "was

7

designed to prevent" "a situation in which two cases involving *precisely the same issues* are simultaneously pending in different District Courts." *Elecs. for Imaging*, 2008 WL 276567, at *1 (emphasis added). It is not enough that these cases deal with and require me to become familiar with the substance of the Waste Prevention Rule; instead, Defendants must show that the two cases present the same legal questions so that litigating them separately would be a waste of judicial resources. This Defendants cannot do.

Defendants make much of the *Wyoming* court's statement that these two cases are "inextricably intertwined." *Wyoming*, Nos. 16-cv-0280, 16-cv-0285 (D. Wyo. Dec. 29, 2017) [Dkt. Nos. 184, 189] at 4. For purposes of the *Wyoming* court's decision to issue the stay, I agree that the resolution of this litigation is "inextricably intertwined . . . with the ultimate rules to be enforced" because the resolution here determines the timing of the effectiveness of the Waste Prevention Rule's provisions, and therefore which provisions the *Wyoming* court will review and the ripeness of those cases. While the cases can be said to be inextricably intertwined due to the implications on timing and effectiveness of the Waste Prevention Rule's provisions, they are otherwise substantively distinct, and the challenges to each raise unique legal questions and require the evaluation of two separate rules promulgated for different reasons.

Given the distinctions between the two cases, Defendants' arguments regarding the threat of "inconsistent judgments" are unfounded because this litigation does not require an evaluation of the Waste Prevention Rule. Defendants argue that disposition in this case will necessarily require me to review the underlying Waste Prevention Rule and evaluate its substantive provisions, as it serves as the benchmark by which the Suspension Rule will be judged. While it is true that I must review the Waste Prevention Rule insofar as I am required to determine whether, for example, the Suspension Rule rests on factual findings that contradict those underlying the Waste Prevention Rule, that is the extent to which I am required to review the Waste Prevention Rule. I need not evaluate the merits of its substance or the persuasiveness or propriety of its justifications. Indeed, I express no judgment whatsoever in this opinion on the merits of the Waste Prevention Rule. Instead, I need only look to see whether any contradictions exist between the two rules, and if so, whether the Suspension Rule provides the necessary detailed justification for such a contradiction.

For that reason, this case is distinguishable from *Bay.org v. Zinke*, Nos. 17-CV-03739-YGR, 17-CV-3742-YGR, 2017 WL 3727467 (N.D. Cal. Aug. 30, 2017). In that case, an initial suit was filed in the Eastern District of California in 2005 challenging the United States Fish and Wildlife Service's ("FWS") biological opinions supporting two water projects, which plaintiffs alleged would harm the delta smelt. *Id.* at *2. A separate case was filed in 2017 in the Northern District of California challenging the biological opinion underpinning a new FWS water project, which plaintiffs alleged "[wa]s the latest in a long line of water diversion projects and policies, including the [earlier two projects], which have had devastating effects" on the delta smelt. *Id.* at *3. Those cases required the court to make substantive determinations regarding the biological opinions for three related water projects in the same region, all challenged on similar grounds, and plaintiffs in both cases sought "an order instructing the FWS to reinstate consultation with the relevant organizations to develop different plans." *Id.* at *5. Thus, there was both "overlap in the issues" and a serious possibility for "inconsistent rulings," a concern that is not present in the instant case. Furthermore, it was more efficient for the court to promote "[c]onsistency with respect to the nature and scope of [the sought] consultations, if any." *Id.* Here, the remedy that Plaintiffs seek does not require any coordination with the *Wyoming* case.

Nor would transferring these actions aid judicial efficiency. The *Wyoming* court has already stayed those cases pending the outcomes here, and the most efficient and expedient option is for this court to proceed with the motions for preliminary injunctions, which are fully briefed and ripe for review. Granting Defendants' transfer would require refiling of all the briefing and setting of a new hearing date in the District of Wyoming, incurring delay and contributing to Plaintiffs' alleged irreparable harm.

## C. Plaintiffs'' Choice of Forum

An important additional factor is the plaintiff's choice of forum.[3] Although it is not a statutory requirement, the Supreme Court has placed a strong emphasis on the plaintiff's choice of forum. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981) ("[T]here is ordinarily a strong

---

[3] The parties agree that the other factors are irrelevant or neutral.

9

presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum."); *see also Ravelo Monegro v. Rosa*, 211 F.3d 509, 513 (9th Cir. 2000) (noting the "strong presumption in favor of a domestic plaintiff's forum choice"); *Ctr. for Biological Diversity v. McCarthy*, No. 14-cv-05138-WHO, 2015 WL 1535594, at *3 (N.D. Cal. Apr. 6, 2015) (plaintiff's" choice of forum receives substantial deference, especially when the forum is within the plaintiff's home district or state") (citing *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987)).

This forum is home to the State of California, a state sovereign, which contains a significant amount of land that stands to be affected by the outcome of this litigation. While Defendants argue that the State of Wyoming has a larger amount of federal and Indian oil and gas development impacted by the Suspension Rule, this does not diminish California's real interest. *See* Mot. at 15 ("[T]he federal minerals in the entire State of California produced 11.5 million barrels of oil and 12.2 billion cubic feet (Bcf) of natural gas."). The State of Wyoming has not sought to intervene in these cases to protect its interests.

Because Defendants have not shown that the convenience or interest of justice factors weigh strongly in favor of transfer, I will not disturb Plaintiffs' choice of venue. The most expedient result is for the case to remain in this district. Defendants' motion for transfer of venue to the District of Wyoming is DENIED.

## II.    Motion for Preliminary Injunction

Plaintiffs move for a preliminary injunction enjoining BLM from enforcing the Suspension Rule, effectively putting the Waste Prevention Rule back into place and requiring immediate compliance. While the parties dispute all of the elements of the preliminary injunction analysis, the most rigorous arguments focus on and the most challenging questions arise under Plaintiffs' likelihood of success on the merits. Plaintiffs raise several challenges to BLM's justifications for the Suspension Rule, contending that it is not supported by a reasoned analysis and is therefore arbitrary and capricious. These challenges, along with the arguments regarding irreparable harm, the balance of equities, and the public interest, will each be addressed in turn.

### A. Likelihood of Success on the Merits

"The Administrative Procedure Act, 5 U.S.C. § 551 et seq., [] sets forth the full extent of judicial authority to review executive agency action for procedural correctness . . . ." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). It permits a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be" either "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Under this standard of review, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action is "arbitrary and capricious if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* "[A] court is not to substitute its judgment for that of the agency." *Fox Television Stations*, 556 U.S. at 513.

When an agency takes an action that represents a policy change, it "must show that that there are good reasons for the new policy," "[b]ut it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute [and] that there are good reasons for it . . . ." *Fox Television Stations*, 556 U.S. at 515. The Supreme Court has advised that "when, for example, [an agency's] new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank state." *Id.* at 515; *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change."). "In such cases it is not that further justification is demanded by the mere fact of the policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations*, 556 U.S. at 515–16; *see also Action for Children's Television v. F.C.C.*, 821 F.2d 741, 745 (D.C. Cir. 1987) ("It is axiomatic that an agency choosing to alter its regulatory course must supply a reasoned analysis indicating its prior

11

policies and standards are being deliberately changed, not casually ignored.").

BLM argues that Plaintiffs conflate the Suspension Rule with the proposed future revision of the Waste Prevention Rule. I agree that I must analyze the Suspension Rule as a discrete agency action separate from any proposed future revision. Because BLM has yet to pass any future revision, its substance, validity, and procedural proprietary are not before this Court. But reviewing the Suspension Rule as a discrete action cuts both ways; while Plaintiffs may not conflate it with any future feared revision, BLM cannot use the purported proposed future revision, which has yet to be passed, as a justification for the Suspension Rule.

Any suggestion, however, that the Suspension Rule should be reviewed with less rigor than any future revision has no merit. *See Fox Television Stations*, 556 U.S. at 515. As BLM agrees with Plaintiffs that the Suspension Rule represents a substantive change in policy, *see* Opp. at 17, it is subject to the standard of review outlined by the Supreme Court in *Fox Television Stations*. BLM does not have to provide the same reasoned analysis in support of a temporary suspension that it would for a future substantive revision, but it must nonetheless provide good reasons for the Suspension Rule. To the extent that its reasoning contradicts the reasoning underlying the Waste Prevention Rule, it must be prepared to provide the requisite good reasons and detailed justification.

Under this framework, Plaintiffs argue that BLM's Suspension Rule is arbitrary and capricious for several reasons. First, they assert that BLM has failed to provide a reasoned analysis for the Suspension Rule because its stated rationales are not legitimate and its justifications are inconsistent with and not supported by the evidentiary record. They also criticize the 2017 Regulatory Impact Analysis ("RIA") underpinning BLM's cost and benefit analysis. Beyond the substance, Plaintiffs argue that the Suspension Rule is inconsistent with BLM's statutory duties and that BLM failed to provide meaningful notice and comment to the public. Each of these arguments, and Defendants' responses, will be considered in turn.

### 1. Whether BLM Provided A Reasoned Analysis for the Suspension Rule

Plaintiffs contend that BLM failed to provide a reasoned analysis with legitimate rationales and justifications supported by the record for the Suspension Rule. BLM's primary rationale in

the Suspension Rule is that it "has concerns regarding the statutory authority, cost, complexity, feasibility, and other implications of the [Waste Prevention] rule, and therefore wants to avoid imposing temporary or permanent compliance costs on operators for requirements that might be rescinded or significantly revised in the near future." 82 Fed. Reg. at 58,050. BLM states that after an initial review of the Waste Prevention Rule in the spring of 2017, it concluded that certain provisions enacted just months earlier "add considerable regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation." *Id.*

Plaintiffs argue that this conclusion is contrary to and inconsistent with BLM's earlier finding that the Waste Prevention Rule imposes "economical, cost-effective, and reasonable measures . . . to minimize gas waste." 81 Fed. Reg. at 83,009. Because BLM's new concerns appear to rest upon factual findings that contradict those underlying its prior policy, BLM must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox Television Stations*, 556 U.S. at 515.

As an example of the Waste Prevention Rule's considerable regulatory burden, BLM first points to operators of marginal or low-producing wells, explaining that "[t]here is newfound concern that this additional burden would jeopardize the ability of operators to maintain or economically operate these wells." 82 Fed. Reg. at 58,050. Plaintiffs argue, however, that BLM provides no analysis or factual data to support this concern. Reviewing the Suspension Rule's discussion of marginal wells, I agree with Plaintiffs. BLM states that it is "reconsidering whether it was appropriate to assume that all marginal wells would receive exemptions from the rule's requirements and whether the assumption might have masked adverse impacts of the [Waste Prevention Rule] on production from marginal wells." *Id.* at 58,051. The Suspension Rule provides no basis for this reconsideration and points to no facts casting doubt on this assumption.

In its briefing, BLM offers that marginal wells "are less likely to support additional compliance costs associated with the LDAR [leak detection and repair] requirements," and that these costs "could cause operators to shut-in marginal wells, thereby ceasing production and reducing economic benefits to local, State, tribal, and Federal governments," citing its 2017 Environmental Assessment in support. Opp. at 24 (internal quotation marks and citation omitted).

Yet the Environmental Assessment provides no citation or factual basis for that claim either, nor does it offer any more detail about what the additional compliance costs are, at what point they would cause shut-in of marginal wells, or the value of the supposed lost benefits. At the hearing on this matter, counsel for the government essentially conceded that it was in possession of no new facts or data underlying this "newfound" concern, but instead contended that it had no burden to point to any such data at this stage because BLM merely suspended the Waste Prevention Rule (as opposed to revoking or revising it). This is contrary to the law and the standard set forth by the Supreme Court under *Fox Television Stations*. Because BLM fails to point to any factual support underlying its concern, the marginal wells cannot serve as a justification for BLM's Suspension Rule.

BLM also expresses concern that certain provisions would have "a disproportionate impact on small operators." 82 Fed. Reg. at 58,051. Under the Waste Prevention Rule, BLM estimated "that average costs for a representative small operator would increase by about $55,200, which would result in an average reduction in profit margin of 0.15 percentage points." 81 Fed. Reg. at 83,013–14. It concluded that this impact was "small, even for businesses with less than 500 employees." *Id.* at 83,013. In the Suspension Rule, BLM's new analysis estimates "the potential reduction in compliance costs to be about $60,000," "result[ing] in an average increase in profit margin of 0.17 percentage points." 82 Fed. Reg. at 58,058. BLM also concludes, in its section evaluating the economic effect on small entities under the Regulatory Flexibility Act ("RFA"), that "the average reduction in compliance costs associated with this final delay rule will be a small fraction of a percent of the profit margin for small companies, which is not a large enough impact to be considered significant." *Id.* at 58,064.

Plaintiffs argue that there is no significant difference between the burden imposed by the Waste Prevention Rule and the reduction associated with the Suspension Rule, given that they both represent a fraction of a percentage point. BLM's characterizations of those savings concede as much. Given that, BLM's concern that small operators' ability to maintain or economically operator their wells would be jeopardized is unfounded. While BLM attempts to explain that its significance finding was "not made as a general determination that $60,000 savings is irrelevant

14

for a small business . . . , but rather as part of its analysis to determine whether it is required to prepare a regulatory flexibility analysis" per the RFA, Opp. at 23, the RFA requires BLM to evaluate whether a "rule would have a significant economic impact, either detrimental or beneficial, on a substantial number of small entities" so as "to ensure that government regulations do not unnecessarily or disproportionately burden small entities." 82 Fed. Reg. at 58,064. BLM does not explain how or why it could conclude that the calculated costs could be so insignificant as not to unnecessarily or disproportionately burden small entities within the meaning of the RFA, and simultaneously conclude that there would be a disproportionate effect for other purposes. Nor could it, as these two positions are entirely inconsistent. Nor does BLM attempt to show in a concrete manner how the $55,200 burden of the Waste Prevention Rule would affect small operators; BLM does not quantify how many would no longer be able to operate given the cost of compliance, nor does it provide any other metric for qualitatively evaluating the impact on small operators.[4] And even if BLM had provided such factual evidence, by itself it would not justify the Suspension Rule, as the rule is not properly tailored and does not merely suspend the Waste Prevention Rule as applied to small operators, but instead is a blanket suspension as to all operators, regardless of size. For these reasons, I agree with Plaintiffs that BLM's concerns about small operators cannot serve as a justification for the change in policy that the Suspension Rule represents.

BLM similarly expresses concern about the Waste Prevention Rule's calculation on impacts on royalties. BLM states that it is reexamining the 2016 RIA underlying the Waste Prevention Rule and its conclusion that royalty payments would increase under the Waste Prevention Rule. The basis for this reconsideration appears to be that

> [s]ome commenters were concerned that the [Waste Prevention Rule] would impact oil and gas development on tribal reservations and royalties to tribes. Some tribes are located in known shale play areas and contain large amounts of undeveloped or underdeveloped areas. In particular, the commenters suggested that the [Waste Prevention Rule] could delay drilling on or drive industry away from tribal lands, reducing income flowing to

---

[4] At the hearing on this matter, Defendants urged that many of these small entities were "mom and pop shops" with fewer than 15 employees. According to BLM's "Detail of Small Businesses Impacts Analysis," the average small entity reports 181 employees, and only two of the 26 examples provided had fewer than 15 employees. *See* 2016 RIA at 183.

15

Indian mineral owners and tribal economies.

82 Fed. Reg. at 58,059.  While these commenters' concerns might be valid, BLM does not provide any factual support for their concern, explain how the Waste Prevention Rule would result in such an impact, or attempt to calculate or even estimate any quantifiable effect on royalties.  This concern is directly contradicted by the 2016 RIA, which estimated a significant increase in total royalties.  *See id.* at 58,057.  BLM's explanation falls short of meeting the requisite reasoned analysis, let alone the "more detailed justification" required when contradictory findings are involved.  *See Fox Television Stations*, 556 U.S. at 515.

Plaintiffs further criticize the Suspension Rule for reaching conclusions in support of the Suspension Rule that contradict its stated factual findings.  While BLM states that some provisions of the Waste Prevention Rule would "unnecessarily encumber energy production, constrain economic growth, and prevent job creation," 82 Fed. Reg. at 58,050, it provides no support for this claim, and later states that the Suspension Rule will not "significantly impact the price, supply or distribution of energy," nor "substantially alter the investment or employment decisions of firms," *id.* at 58,057.  BLM argues that these statements are taken out of context, and instead that the Suspension Rule will not significantly impact price supply, or distribution of energy worldwide because "relative changes in production compared to global levels are expected to be small."  *Id.* While this may be true, BLM does not then point to any fact that justifies its assertion that the Waste Prevention Rule encumbers energy production.  Its concern remains unfounded.  BLM further argues that its finding regarding employment and investment decisions of firms was based on its findings in the 2016 RIA, which are under review.  While this again may be true, that simply means that as of right now, the 2016 RIA remains the most recent factual finding on that point.  BLM fails to point to contradictory evidence that could support an alternate conclusion.

Perhaps the BLM's best justification for the Suspension Rule is its concern that not all of the Waste Prevention Rule's provisions will survive judicial review.  *See* 82 Fed. Reg. at 58,050. BLM states that the *Wyoming* court "express[ed] concerns that the BLM may have usurped the authority of the Environmental Protection Agency (EPA) and the States under the Clean Air Act, and questioned whether it was appropriate for the Waste Prevention Rule to be justified based on

1    its environmental and societal benefits, rather than on its resource conservation benefits alone."

2    *Id.*; *see also Wyoming*, 2017 WL 161428, at *8, *10. Unlike several other of BLM's concerns,

3    this one is grounded in a federal judge's reasoned skepticism outlined in a judicial order regarding

4    the propriety of the Waste Prevention Rule. While this concern for judicial review may serve to

5    justify a suspension or delay of specific provisions addressed by the court in order to evaluate

6    BLM's authority with respect to EPA's, BLM concedes that the Suspension Rule was not tailored

7    with this in mind, but rather "tailored [] to achieve its goal of relieving operators and the agency of

8    the burden of complying with a rule that may shortly change." Opp. at 22. To the extent that

9    BLM's concern regarding judicial review is a legitimate one, the Suspension Rule is an

10   inappropriate response because it is not tailored to address that issue.[5]

11            BLM argues that for this Court to require it to provide the necessary factual underpinnings

12   in support of the Suspension Rule, BLM would be at risk of a predetermination challenge. BLM

13   misunderstands its burden. It need not provide a level of analysis equivalent to the Waste

14   Prevention Rule in support of the Suspension or equivalent to any future revision rule. But it must

15   provide at least some basis—indeed, a "detailed justification"— to explain why it is changing

16   course after its three years of study and deliberation resulting in the Waste Prevention Rule. New

17   facts or evidence coming to light, considerations that BLM left out in its previous analysis, or

18   some other concrete basis supported in the record—these are the types of "good reasons" that the

19   law seeks. Instead, it appears that BLM is simply "casually ignoring" all of its previous findings

20   and arbitrarily changing course. *See Action for Children's Television*, 821 F.2d at 745. Given the

21   various concerns that contradict the factual findings underpinning the Waste Prevention Rule, and

22   BLM's failure to provide the detailed justifications necessary to explain such contradictions in

23   support of the Suspension Rule, Plaintiffs have shown a reasonable likelihood of success on the

24   merits of their claim that the Suspension Rule is not grounded in a reasoned analysis and is

25   therefore arbitrary and capricious.

26

27   _____

28   [5] Indeed, if BLM had not moved in June of 2017 to extend the briefing schedule by 90 days in the Wyoming litigation, that court might have completed its review of the record and resolved the BLM's concerns in this regard.

1      That said, I will continue to address all of the parties' arguments regarding Plaintiffs'

2   likelihood of success on the merits.

3                  **2.  Whether the Suspension Rule is Based on a Flawed RIA**

4      Plaintiffs next contend that the Suspension Rule is based on a flawed RIA. They launch

5   three attacks on the RIA to argue that because it improperly calculates the costs and benefits of the

6   Waste Prevention Rule, the Suspension Rule is not the result of a reasoned analysis.

7      First, Plaintiffs argue that the BLM assumes that the Waste Prevention Rule will only be

8   delayed for one year, then instituted in its current form, while BLM has made clear that it intends

9   to rescind or revise most of the Waste Prevention Rule's suspended provisions.  Regardless of

10   BLM's plans or intentions, however, it has yet to pass a future revision.  Neither Plaintiffs nor

11   BLM nor I can say with any certainty, at this time, what form the future revision will take, if any.

12   It would be improper for BLM to base its calculations on anything but what is known today.

13      Currently, after the year of the Suspension Rule is over, the Waste Prevention Rule is set to

14   go back into effect in its unrevised form.  For this reason, the RIA's assumption that the air quality

15   and climate benefits of the Waste Prevention Rule will only be lost for one year is acceptable.

16   What is not acceptable, however, is that the Suspension Rule then includes the reductions in

17   compliance cost in its calculations of net benefits, as though such reductions would be permanent

18   and no costs would be incurred in 2019 after the Suspension Rule expires and the Waste

19   Prevention Rule is put into place.  The BLM estimates such reductions to be between $110 to

20   $114 million.  *See* 2017 RIA at 37.

21      BLM cannot have it both ways: either the air quality and climate benefits will be lost

22   indefinitely and not for only one year because the Waste Prevention Rule is not going into effect,

23   and thus industry will never incur the compliance costs, or the air quality and climate benefits are

24   lost for only one year, and there are no reductions in compliance cost because those costs are

25   simply delayed for one year.  BLM cannot base its calculations on inconsistent assumptions to

26   inflate its calculation of the net benefits.  Given this serious flaw, the RIA's calculation of total net

27   benefits from 2017 to 2027, which depending on discount rate ranges from $19 to $52 million, *see*

28   *id.* at 46, either deeply underestimates the lost air quality and climate benefits, or overestimates the

                                                    18

reduction in compliance costs. The total net figure is likely negative.

Plaintiffs' second argument is that BLM assumes without evidence in its calculations that no operators have undergone any compliance activities to meet the original January 17, 2018 deadlines under the Waste Prevention Rule, thereby likely overestimating the industry cost savings. The Waste Prevention Rule was effective on January 17, 2017, and in effect for the next five months before BLM attempted to postpone the rule on June 15, 2017. BLM responds that "[t]here is not [] a public count of operators who have not complied with the Waste Prevention Rule, rendering a precise estimate of compliance cost savings elusive," and thus it determined "that many operators are not poised to comply with the [Waste Prevention] Rule," calling its determination "a judgment call." Opp. at 39. But BLM does not provide any factual basis for this arbitrary assumption. Moreover, the monetary amount that operators have already spent or will need to spend in order to come into compliance is a numerical figure capable of being determined, even if neither party has taken steps to calculate that number.

Obtaining factual, objective data and values is not subject to "judgment calls." Judgment calls are for the determination of subjective values, such as what the "best" course of action is or what constitutes reasonable doubt. Contrary to BLM's assertion, its baseless calculation of industry cost savings is not a "judgment call" entitled to deference, but rather an estimated figure that lacks a reasonable basis.

Plaintiffs' third attack on the 2017 RIA concerns BLM's failure to consider the global costs of increased methane emissions, which Plaintiffs characterize as effectively dismissing 90 percent of the associated costs. Cal. Mot. at 21. BLM justifies this change for two reasons. First, BLM argues that Executive Order 13783 directed agencies to ensure their analyses are consistent with the guidance in the Office of Management and Budget ("OMB") Circular A-4, which emphasizes that any regulatory analysis "should focus on benefits and costs that accrue to the citizens and residents of the United States." While Plaintiffs argue that the same Circular directs BLM to encompass "all the important benefits and costs likely to result from the rule," including "any important ancillary benefits," it does not specifically mandate that agencies consider global impacts. BLM also explains that since the 2016 RIA, "Section 5 of Executive Order 13793

withdrew the technical support documents on which the 2016 RIA relied for the valuation of the changes in methane emissions using a global metric." Opp. at 39. BLM has a broad mission and is in a better position than the plaintiffs to consider what constitutes an "important" benefit. It has provided a factual basis for its change in position (the OMB circular and Executive Order 13793) as well as demonstrated that the change is within its discretion, at least with respect to this aspect of the RIA.

While not all of Plaintiffs' criticisms of the 2017 RIA have merit, Plaintiffs are correct that its estimated cost savings is likely seriously inflated due to the flawed and inconsistent assumptions underpinning the compliance cost calculation and the reduction in compliance costs. These flaws in the RIA provide a separate reason that the Suspension Rule is not based on a reasoned analysis.

### 3. Whether BLM Failed to Consider Its Statutory Duties

Plaintiffs also argue that the Suspension Rule is arbitrary and capricious because BLM has "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 42–43, in this case, its mandated statutory duties to prevent waste of public natural resources. Plaintiffs point to BLM's earlier findings that "measures to conserve gas and avoid waste may significantly benefit local communities, public health, and the environment," 81 Fed. Reg. at 83,009, as well as that its existing regulations, dating back to 1979, were "not particularly effective in minimizing waste of public minerals," *id.* at 83,017. BLM stated that it "has independent legal and proprietary responsibilities to prevent waste in the production of Federal and tribal minerals, as well as to ensure the safe, responsible, and environmentally protective use of BLM-managed lands and resources." *Id.* at 83,018. Plaintiffs characterize the Suspension Rule, on the other hand, as undermining BLM's statutory duties without explanation, ignoring the reasons articulated for promulgation of the Waste Prevention Rule.

BLM counters that the Suspension Rule is an exercise of its broad authority, under the Mineral Leasing Act of 1920, Federal Oil and Gas Royalty Management Act of 1982, and Indian Mineral Leasing Act of 1938, which grant BLM broad authority to manage mineral development on public and Indian lands. Opp. at 27–28. Its directive under these statutes is not solely to

prevent waste of resources, but also "to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise." *Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967) (citing S. Subcomm. of the Comm. on Interior & Insular Affairs, The Investigation of Oil and Gas Lease Practices, 84th Cong., 2d Sess. 2 (1957)). BLM points to other responsibilities as well, including to "ensure that Indian tribes receive the maximum benefit from mineral deposits on their lands," *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1568 (10th Cir. 1984), to protect "the safety and welfare of workers," 30 U.S.C. § 187, to ensure minerals produced on public lands are sold "to the United States and to the public at reasonable prices," *id.*, "to diversify and expand the Nation's onshore leasing program to ensure the best return to the Federal taxpayer," 30 U.S.C. §226(b)(1)(C), and others. It argues that it has been delegated the authority to balance its broad range of responsibilities and is in the best position to evaluate how to weigh competing concerns.

I agree with BLM that given its range of statutorily-mandated duties and responsibilities, it is best suited to evaluate its competing options and choose a course of action. The Suspension Rule, when considered as a discrete action and without guessing as to the content of any future proposed revision, does not necessarily represent an abdication of BLM's duty to prevent waste. Its effect is to delay the Waste Prevention Rule's provisions for one year, at which point the Rule is set to go into effect. Thus, Plaintiffs' contention that the Suspension Rule is arbitrary and capricious because it does not consider BLM's statutory duties fails. Simply because BLM does not fulfill its statutory duties in the manner that Plaintiffs would prefer does not mean that it failed to consider them.

### 4. **Whether BLM Has Prevented Meaningful Comment on the Suspension Rule**

Plaintiffs finally argue that the Suspension Rule is unlawful because it violates the basic requirement that agencies allow for meaningful comment on their proposed rules. *See* 5 U.S.C. § 553(c); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995) ("The purpose of the notice and comment requirements is to provide for meaningful public participation in the rule-making process."). Plaintiffs argue that the notice and comment in this case was not meaningful

1    because Secretary Zinke had already determined the outcome of the rulemaking before receiving

2    comment and limited the scope of the rulemaking comments so as not to consider those addressing

3    the substance of the Waste Prevention Rule or Suspension Rule.

4        BLM responds that "predetermination" is a high standard, citing cases arising in the

5    context of environmental impact reviews under the National Environmental Protection Act

6    ("NEPA").  *See* Opp. at 33.  BLM cites no cases showing that this standard for predetermination,

7    however, has ever been applied outside the context of NEPA environmental impact reviews.

8    Instead, other circuit courts have evaluated whether comment was meaningful by evaluating

9    whether an agency "remained 'open-minded' about the issues raised and engage[d] with the

10   substantive responses submitted." *Prometheus Radio Project v. F.C.C.*, 652 F.3d 431, 453 (3d

11   Cir. 2011) (internal citations omitted); *Rural Cellular Ass'n v. F.C.C.*, 588 F.3d 1095, 1101 (D.C.

12   Cir. 2009) ("The opportunity for comment must be a meaningful opportunity, and we have held

13   that in order to satisfy this requirement, an agency must also remain sufficiently open-minded.")

14   (internal citations omitted).[6]

15       In *Prometheus Radio Project*, for example, the Third Circuit concluded that an agency did

16   not keep the requisite open mind where a draft of the proposed rule was circulated internally two

17   weeks before the comment period closed and before most of the comments were received, and the

18   final vote occurred within a week of the response deadline.  652 F.3d at 453.  In contrast, in *Rural*

19   *Cellular*, the D.C. Circuit noted that the agency "compiled a record that included 113 sets of

20   comments from interested parties, considered those comments" by properly taking the views of

21   both supporters and critics into account and responding to specific critiques of the rule in the final

22   order, and "did not issue the Order until the required rulemaking was complete.  Nothing else is

23

24   ---
     [6] While these formulations are similar to that in *Nehemiah Corp. of Am. v. Jackson*, 546 F. Supp.
     2d 830, 847 (E.D. Cal. 2008), which Plaintiffs cite in support of their argument, these cases are
25   more directly on point because they deal specifically with the meaningfulness of the comment
     period under the APA, whereas *Nehemiah* and the authority it cites discuss disqualification of an
26   official for prejudgment.  As the issue of disqualification is not presently before me, I follow the
     standards expressed by *Prometheus Radio Project* and *Rural Cellular*.  It is nonetheless worth
27   noting, however, that in *Nehemiah*, the court explained that "[m]ere proof that the official has
     taken a public position, or has expressed strong views, or holds an underlying philosophy with
28   respect to an issue in dispute is not enough to overcome the presumption that an official is
     objective and fair."  546 F. Supp. 2d at 847 (internal quotation marks and citation omitted).

required." 588 F.3d at 1101.

In this case, BLM has followed the required procedures and addressed specific comments in support of and in opposition to the Suspension Rule in an 89-page response. Nothing in the timeline of its process shows an impermissible predetermination or closed mindedness, as was the case in *Prometheus Radio Project*. Nor does the response to the comments suggest that BLM simply ignored the public participation in the deliberative process.

Plaintiffs' argument regarding the Secretary's limitation of the scope of the comments, however, has more merit. Secretary Zinke refused to consider comments regarding the substance or merits of the Waste Prevention Rule, determining that they were outside the scope of the Prevention Rule. For example, Secretary Zinke deemed comments asserting that the Waste Prevention Rule did not burden industry given companies' financial performance and job growth as outside the scope of the Suspension Rule. These comments, however, bear directly upon the Secretary's stated rationales for the Suspension Rule; indeed, the Suspension Rule explains that "[o]perators have raised concerns regarding the cost, complexity, and other implications of [the Waste Prevention Rule]." 82 Fed. Reg. at 58,058. The Secretary cannot, on the one hand, use concerns about cost and complexity to industry as a justification for the Suspension Rule, only to deny comments about the financial and economic burden to industry as outside the scope of the Suspension Rule, on the other.

Similarly, the Suspension Rule repeatedly expresses concerns that the Waste Prevention Rule is unnecessarily burdensome on industry, but the Secretary excluded comments that the Waste Prevention Rule "is not burdensome to operators because jobs have not been lost and [] drilling activity is increasing." Opp. at 34–35 (internal quotation marks and citations omitted). The relevant burden of the Waste Prevention Rule cannot serve as a justification for the Suspension Rule and yet at the same time be outside the scope for purposes of comment. While his actions in this case are certainly not as egregious those in *North Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 769 (4th Cir. 2012), the matters that the Secretary refused to consider were "not only 'relevant and important,' but were integral to the proposed agency action." For these reasons, the Secretary's content restrictions on the comments to the Suspension

United States District Court
Northern District of California

23

Rule prevented meaningful comment on key justifications underpinning the Suspension Rule. That is insufficient to satisfy the APA.

Taking all parties' concerns into consideration, I agree with Plaintiffs that BLM has failed to provide the requisite reasoned analysis in support of the Suspension Rule, and it is therefore arbitrary and capricious within the meaning of the APA. BLM's contention that this result would mean that "an agency would never temporarily suspend a rule pending reconsideration— regardless of the costs imposed by the rule in the interim—because it would have to engage in the same level of analysis for the suspension as it would for any future substantive revision," Opp. at 36–37, is incorrect. Instead, I simply conclude that on the record before me, Plaintiffs are likely to succeed on their claim that BLM failed to consider the scope of commentary that it should have in promulgating the Suspension Rule and relied on opinions untethered to evidence, which is required to give a reasoned explanation to suspend the Waste Prevention Rule (that had an evidentiary basis).

### B. Irreparable Harm

Plaintiffs argue that without a preliminary injunction of the Suspension Rule, they will suffer irreparable harm in the form of waste of publicly-owned natural gas, increased air pollution and related health impacts, exacerbated climate harms, and other environmental injury such as noise and light pollution. In order to obtain a preliminary injunction, "a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (emphasis in original). The Ninth Circuit recognizes the "well-established public interest in preserving nature and avoiding irreparable environmental injury." *Cottrell*, 632 F.3d at 1138 (internal quotation marks and citation omitted). "While . . . it would be incorrect to hold that all potential environmental injury warrants an injunction, . . . [t]he Supreme Court has instructed us that [e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (citing *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir.2008) (en banc)).

24

In *League of Wilderness Defenders*, for example, the Ninth Circuit found that "the logging of thousands of mature trees" was a likely, irreparable harm that "c[ould not] be remedied easily if at all" by the "planting of new seedlings nor the paying of money damages." 537 F.3d at 764. On the other hand, in *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1261–62 (W.D. Wash. 2015), the district court concluded that plaintiffs' assertion that "likely *potential* impacts and harm to Pacific lamprey *can* result from disturbance from dredge activities" fell short of demonstrating the requisite likely irreparable harm sufficient for the court to issue a preliminary injunction.

While Plaintiffs' assertions do not involve logging or damage to wildlife habitats, they do involve other concrete harms that BLM's own data suggests are significant and imminent. BLM estimates that the Suspension Rule *will* result in emissions of 175,000 additional tons of methane, 250,000 additional tons of volatile organic compounds, and 1,860 additional tons of hazardous air pollutants over the course of the year. 82 Fed. Reg. at 58,056–57. These numbers support Plaintiffs' concerns that the additional emissions will cause irreparable public health and environmental harm to Plaintiffs' members who live and work on or near public and tribal lands with oil and gas development. BLM characterizes the methane emissions, for example, as "infinitesimal," or "roughly 0.61 percent of the total U.S. methane emissions in 2015." Opp. at 12. But Plaintiffs submit affidavits from scientists who posit otherwise. Dr. Ilissa B. Ocko, climate scientist, states that the 175,000 additional tons of methane that will result during the one-year suspension is "equivalent to the 20-year climate impact of over 3,000,000 passenger vehicles driving for one year or over 16 billion pounds of coal burned." *See* App'x to Sierra Club Mot. at 499 ¶ 11. Dr. Renee McVay, whose research focuses on atmospheric chemistry, estimates that approximately 6,182 wells subject to the Waste Prevention Rule are located in counties already suffering from unhealthy air with elevated ozone levels. *See id.* at 786 ¶ 19. The Suspension Rule will result in additional emissions of 2,089 tons of VOCs in these already at-risk communities, where many of the conservation and tribal group plaintiffs' members reside, leading to and exacerbating impaired lung functioning, serious cardiovascular and pulmonary problems, and cancer and neurological damage. *See id.*; Sierra Club Mot. at 21.

25

Plaintiffs also provide several sworn affidavits from their individual members, attesting to the imminent and particularized harms from which they do and will suffer as a result of the Suspension Rule. Environmental Defense Fund member Francis Don Schreiber, for example, resides on a ranch in Governador, New Mexico, where there are 122 oil and gas wells either on or immediately adjacent to his land, all managed by BLM and subject to the Suspension Rule. *See* App'x to Sierra Club Mot. at 476–77. He notices an "extremely strong" "near-constant smell from leaking wells," which "make[s] breathing uncomfortable" and causes concern that he and his wife "are breathing harmful hydrocarbons." *Id.* at 479. As Schreiber suffers from a heart condition and has already had open heart surgery, he is "at a higher risk from breathing ozone," and is "constantly concerned about the impact of the air quality on [his] heart condition." *Id.* at 480. Plaintiffs provide similar affidavits from several other members. *See, e.g.*, *id.* at 510–16, 532–36, 562–64, 569–72, 627–31, 653–55, 717–22.

Nor does BLM dispute Plaintiffs' assertion that once such pollutants are emitted, they cannot be removed. The State of California, for example, asserts that once methane is released into the atmosphere, it contributes to irreparable harms, including a reduction in average annual snowpack (and therefore water supply), increased erosion and flooding from rising sea levels, as well as extreme weather events. *See* Cal. Mot. at 23. The State of New Mexico faces increased instances of water and electricity supply disruptions, drought, insect outbreak, and wildfire. *Id.* at 24. These are serious and irreparable harms that are directly linked to methane emissions.

Moreover, contrary to BLM's contention that increased air pollution is "incremental in nature" and does not require immediate relief, several courts, including the Supreme Court, have found that increased air pollution can constitute irreparable harm. *See, e.g.*, *Beame v. Friends of the Earth*, 434 U.S. 1310, 1314 (1977) (Marshall, J., in chambers) (recognizing "irreparable injury that air pollution may cause during [a two month] period, particularly for those with respiratory ailments); *Sierra Club v. U.S. Dep't of Agriculture, Rural Utils. Serv.*, 841 F. Supp. 2d 349, 358 (D.C. Cir. 2012) (concluding that plaintiff demonstrated irreparable harm where coal plant expansion would "emit substantial quantities of air pollutants that endanger human health and the environment"). Similar to *Sierra Club v. U.S. Department of Agriculture*, Plaintiffs have provided

affidavits from climate scientists and researchers supporting their assertions that the exposure to air pollution resulting from the Suspension Rule will have irreparable consequences for public health. *Compare Sierra Club v. U.S. Dep't of Agriculture*, 841 F. Supp. 2d at 358–59, *with* Sierra Club Mot. at 20–22. Plaintiffs have also offered affidavits from individual members showing concrete and particularized harms to respiratory health. *See Beame*, 434 U.S. at 1314. These affidavits are acceptable and sufficient to establish the requisite irreparable harm.[7]

BLM argues that Plaintiffs nonetheless cannot show that any alleged harms are "imminent" because operators are not ready to comply and will be unable to do so immediately. The relationship between these two contentions is unclear. Whether or not operators are ready to comply does not negate the imminence of Plaintiffs' harms; that operators are not currently poised to comply with the Waste Prevention Rule suggests that the harms to Plaintiffs from waste of natural gas and pollution would be even greater than estimated the longer that operators fail to comply. All the while, the wasted gas and emissions will continue to increase, leading to further irreparable harm.

Plaintiffs list several environmental injuries with effects statewide, to the general public, and on the personal level, any of which might be sufficient to establish likely irreparable harm. Considered collectively, plaintiffs easily meet their burden. Defendants' attempts to diminish these harms as merely incremental is unsupported by science as well as case law. For these reasons, I conclude that Plaintiffs have sufficiently demonstrated irreparable harm.

## C. Balance of Equities and Public Interest

Finally, Plaintiffs must show that "the balance of equities tips in his favor, and that an

---

[7] BLM cites *Asarco, Inc. v. EPA*, 606 F.2d 1153, 1160 (9th Cir. 1980), and other cases for the proposition that the Court may not consider the "extra-record declarations" submitted by Plaintiffs "in evaluating the 'correctness or wisdom' of BLM's decision." *See* Opp. at 14 n.10. BLM is correct that it would be improper to consider these affidavits for purposes of substantive evaluation of the Suspension Rule under the APA. *See Asarco*, 606 F.2d at 1160 ("The same cases make clear that judicial consideration of evidence relevant to the substantive merits of the agency action but not included in the administrative record raises fundamentally different concerns."). I do not consider these affidavits in my analysis of the merits of the Suspension Rule and the arbitrary and capricious inquiry, as it would be inappropriate to look beyond the administrative record in so doing. The separate question of irreparable harm, however, is not limited to the administrative record, *see Sierra Club v. U.S. Dep't of Agriculture*, 841 F. Supp. 2d at 358–59, and none of the cases BLM cites discuss irreparable harm.

injunction is in the public interest." *Winter*, 555 U.S. at 20. The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24. All parties contend that the public benefits of their desired outcome are significant and urge the Court to find in their favor.

Plaintiffs focus on the loss of valuable natural resources through wasted gas, reduced royalties to local, state, and tribal entities, increased air pollution, the serious environmental harm to the public, as well as noise and visual nuisance. Defendants, for their part, argue that the Suspension Rule conserves the resources of operators and the agency while BLM reconsiders the Waste Prevention Rule. BLM estimates these costs to be approximately $110 to $114 million (depending on discount rates to annualize capital costs). *See* Opp. at 15. BLM also estimates that the initial upfront unrecoverable costs in 2018 would be $91 million. *Id.* They argue that "savings in compliance costs as compared to the monetized value of the increase in emissions and reduced captured gas results in a net benefit of $64–68 million, or $83–86 million depending on the discount rate used, during the suspension year." *Id.* at 15–16.

As previously discussed, these calculations are flawed because BLM assumes that compliance costs would never be incurred by industry, which is inconsistent with the Suspension Rule. Because it purports to merely suspend or delay compliance with the Waste Prevention Rule by only one year, those compliance costs are not saved, merely delayed. Even if I were to take these costs into consideration, placing these figures in context helps to understand their impact. Plaintiffs note that the average impact on individual businesses is insignificant; as previously discussed, even small operators will see an expected increase in profits of only 0.17%, a marginal amount, as a result of the Suspension Rule. Weighed against the likely environmental injury, which cannot be undone, the financial costs of compliance are not as significant as the increased gas emissions, public health harms, and pollution. *See, e.g.*, *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) ("[I]t is well settled that economic loss does not, in and of itself, constitute irreparable harm.") (internal quotation marks and citation omitted); *accord Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1204 (9th Cir. 1980) (concluding that where plaintiff "has not shown that it will suffer any injury apart from

28

economic injury," its "injury is, therefore, not irreparable") (Wallace, J., concurring). Plaintiffs have demonstrated that these harms will have substantial detrimental effects on public health, and unlike economic loss, cannot be recovered. Thus, balancing the equities and considering both sides' impacts and costs, as well as the public interest, I conclude that the balance weighs in favor of granting the preliminary injunction.

Plaintiffs have provided several reasons that the Suspension Rule is arbitrary and capricious, both for substantive reasons, as a result of the lack of a reasoned analysis, and procedural ones, due to the lack of meaningful notice and comment. They have demonstrated irreparable harm and that the balance of equities and public interest strongly favor issuing the preliminary injunction sought. Because I conclude that they have met their burden on each element, I GRANT Plaintiffs' preliminary injunction enjoining enforcement of the Suspension Rule.

## CONCLUSION

For the foregoing reasons, Defendants' motion to transfer venue to the District of Wyoming is denied. Plaintiffs' motion for a preliminary injunction is GRANTED.

**IT IS SO ORDERED.**

Dated: February 22, 2018

William H. Orrick
United States District Judge